**State of CALIFORNIA, on behalf of the CALIFORNIA DEPARTMENT OF TOXIC SERVICES, Plaintiff,**

**v.**

**NEVILLE CHEMICAL COMPANY, a corporation; and DOES 1–10, Defendants.**

**No. CIV.00–10205 CAS(Ex).**

United States District Court, C.D. California, Western Division.

March 26, 2002.

---

Bill Lockyer, Attorney General, Theodora Berger, Senior Assistant Attorney General, Donald Robinson, Supervising Deputy Attorney General, Laurie Pearlman, Deputy Attorney General, Harrison Pollak, Deputy Attorney General, Office of Attorney General of California, Los Angeles, CA, for Plaintiff.

Thomas H. Clarke, Jr., Dennis J. Byrne, Ropers, Majeski, Kohn & Bentley, LLP, San Francisco, CA, for Defendant.

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

SNYDER, District Judge.

## I. INTRODUCTION

This case is a cost-recovery action brought by plaintiff State of California on behalf of the Department of Toxic Substances Control ("DTSC")[1] under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.* DTSC seeks to recover costs associated with the cleanup of hazardous substances at a chemical manufacturing plant owned and operated by defendant Neville Chemical Company ("Neville"). The parties are now before the Court on DTSC's motion for summary judgment.

## II. FACTS

### A. Background

Neville is the owner and operator of a 3.5 acre industrial facility in Santa Fe Springs, California (the "site"). Compl. ¶ 6. From 1952 to approximately 1987, Neville manufactured chemical compounds for use in insecticides, solvents, metalworking lubricants and flame retardants at the site. *Id.* ¶ 8. Investigations at the site found that the soil and groundwater were significantly contaminated with hazardous sub-

---

1. The Court will refer to plaintiff as DTSC.

stances from Neville's past handling, storage and disposal practices. *Id.* ¶ 11. In 1986, DTSC[2] ordered Neville to clean up the site pursuant to a Remedial Action Order ("RAO"). Declaration of Harlan Jeche in Support of Pl's. Mot. for Summ. Judg. ("Jeche Decl.") ¶ 9. The RAO required Neville to prepare a remedial investigation and feasibility study ("RI/FS"), and a remedial action proposal ("RAP"), both in accordance with the National Contingency Plan ("NCP"). *Id.*, Ex. B at 174 (RI/FS), 181(RAP). According to the terms of the RAO, Neville would then have to implement the RAP, and would be responsible for all operation and maintenance requirements of the RAP until the remediation goals of the RAP were met. *Id.*, Ex. B at 182. The RAO contains a provision for recovery of certain costs pursuant to state law. *Id.*, Ex. B at 188.

DTSC alleges that its employees have spent thousands of hours since 1985 responding to releases and threatened releases of hazardous substances at the Neville facility, and overseeing Neville's own response measures. Jeche Decl. ¶ 10. The response measures undertaken at the Neville facility include: the removal of twenty one drums containing dichlorobenzenes, carbon tetrachloride, and chlorinated paraffins that had been illegally buried at the site; recontouring the soil and capping it with asphalt; installing a groundwater extraction-and-treatment system; and recording a deed restriction to prevent future uses of the site which would be harmful to humans and the environment. *Id.* ¶ 11. DTSC alleges that as of September 30, 2001, its response costs for the Neville facility total $759,368.29, exclusive of interest and attorneys' fees.[3]

**B. Cost Recovery**

In April 1985, DTSC filed suit against Neville in Superior Court for the County of Los Angeles. The relief sought in that action included the recovery of costs pursuant to California Health and Safety Code Section 25360 ("Section 25360"). Declaration of Dennis J. Byrne in support of Neville's Opp'n to Mot. for Summ. Judg. ("Byrne Decl."), Ex. A. Section 25360 provides:

> Any costs incurred and payable from the state account [the Hazardous Substance Account] shall be recovered by the department from the liable person or persons. In addition, such person or persons shall be liable to the department for administrative costs actually incurred, or five hundred dollars ($500), whichever is greater. The amount of costs determined pursuant to this section shall be recoverable in a civil action.

On December 10, 1986, DTSC issued the RAO to Neville, instructing it to conduct an RI/FS, and prepare and implement an RAP. Section III of the RAO stated a number of conclusions of law, which were based upon the application of California law. Byrne Decl., Ex. C at 16. Section 8.16 of the RAO, entitled "Cost Recovery," provided that

> Failure or refusal of [Neville] to comply with this Order may make [Neville] liable for any government costs incurred, including those payable from the Hazardous Substance Cleanup Fund for any remedial action at the site, as provided in Section 25360 of the Health and Safety Code and other applicable provisions of law. These costs include DHS's direct costs and DHS's administrative

---

**2.** DTSC was a division of the California Department of Health Services ("DHS") until it became a separate department sometime in 1991. For ease of reference, the Court will utilize the term DTSC throughout.

**3.** This total includes a $46,636.38 "activity fee" that Neville has already paid to DTSC.

overhead costs in an amount equal to 10 percent of the reasonable cost actually incurred, or five hundred dollars ($500), whichever is greater. In addition, [Neville] may be liable for the costs of oversight by DHS of [Neville's] activities at the site as provided in Section 25360 of the Health and Safety Code. Respondents may also be liable to the Department for punitive damages up to three times the amount of any costs incurred by the state account pursuant to Section 25359 of the Health and Safety Code.

*Id.*, Ex. C at 32.

On January 30, 1987, Angelo Bellomo, Chief of the Southern California Section of DTSC, wrote to Neville informing it that the Neville facility had been listed on the Hazardous Substance Cleanup Bond Act Expenditure Plan as a site requiring assessment and cleanup action. *Id.*, Ex. D. Attached to the correspondence was a document entitled "Detailed Site Expenditure Plan Neville Chemical Company." In a section entitled "Projected Revenue Sources," the document lists Neville as a responsible party, and then states that "it appears at this time that it may be necessary to utilize bond funds to remediate this site. If bond funds are expended, the Department will undertake cost recovery action." *Id.* The document then sets forth estimated costs for DTSC's cleanup of the site, to be "funded from bond sale proceeds (to the extent that Federal Superfund or responsible party funding .in not available)." *Id.* The estimated costs are listed as $265,000 for site characterization, $60,000 for remedial action plan, and $1,110,000 for remedial action. *Id.*

In January 1987, Neville's Vice President and General Counsel, Thomas McKnight, attended a meeting with representatives of DTSC to discuss the RAO. According to McKnight:

At this meeting DTSC threatened legal action against Neville pursuant to Sections 8.15 and 8.16 of the RAO if Neville failed to fully comply with the RAO. At this meeting, DTSC specifically represented to Neville that it would not be subject to cost recovery litigation if it agreed to voluntarily and fully comply with the RAO. DTSC indicated that they were prepared to perform the site assessment required under the RAO if Neville refused to cooperate.

Byrne Decl., Ex. E, McKnight Decl. ¶ 6.

In September 1987, DTSC approved the workplan Neville submitted for the remedial investigation of the site. McKnight Decl. ¶ 13. On February 19, 1988, DTSC dismissed its pending cost recovery claim against Neville in the Superior Court for the County of Los Angeles. Byrne Decl., Ex. G.

In 1989, the California legislature enacted Chapter 269, 1989 Cal. Stats. Ch. 269, which amended portions of the Health and Safety Code to restructure state funding of the cleanup of hazardous waste sites. Chapter 29 did not amend the cost recovery provisions of Section 25360. However, pursuant to the new legislation, DTSC initiated a program whereby it assessed an "activity fee" program intended to partially cover DTSC's oversight costs in circumstances where a responsible party such as Neville was conducting the actual investigation and remedial activity at a site.

On September 29, 1989, Dennis Dickerson, Regional Administrator for DTSC, sent Neville a letter explaining the activity fee program and assessing an initial activity fee of $46,636.38 for the RI/FS phase of the project. Jeche Decl., Ex. C. The letter reads in relevant part:

The Department of Health Services (Department) has identified you as the party primarily responsible for taking action to characterize and remedy the public health and/or environmental threats posed by the uncontrolled re-

lease of hazardous substances at [the Neville site]. Pursuant to legislation (Chapter 269, Statutes of 1989) which was recently signed into law by the Governor, you are obligated to pay activity fees beginning July 1, 1989, to partially cover the Department's cost of overseeing your action to characterize and satisfactorily remediate this site.

Chapter 269 sets out specific fees for the various phases of activity associated with characterizing and abating hazardous substance release sites based on the relative size of each site as estimated by the Department.... For purposes of establishing a fee for the current phase of activity being conducted at the Neville Chemical Company, the Department has made a preliminary determination that the site is a large as defined by Chapter 269. However, the law does provide for a separate fee ($5,000) to have the Department undertake a study to more accurately determine site size. If you wish to have the Department undertake such a study and pay the additional $5,000 fee you should advise me immediately. In making this decision you should be aware that the law does allow the Department to make adjustments to initial site size determinations so that fee levels may be raised or lowered for subsequent phases of activity based on additional data. However, the law does not allow for retroactive application of such adjustments.

Another feature of Chapter 269 is the proration of fees for phases of investigation and cleanup activity that were underway when the new law took effect on July 1, 1989. Basically, the law says that any identified costs borne by the Department for oversight of an activity which occurred prior to July 1, 1989, will be cost recovered and that the Department must prorate the fee to be assessed for this phase based either on the amount of work completed as of July 1, 1989, or based on the amount of work left to be completed as of that date as estimated by the Department and based on the guidelines established by Chapter 269.

The Department estimates that it will take 18 months to complete the Remedial Investigation/Feasibility Study that was underway at the site on July 1, 1989. Based on the Department's preliminary determination that this site is a large, and the monthly fee quotient is $2,590.91, the prorated fee for this phase of activity is, therefore, $46,636.38.

Chapter 169 requires the State Board of Equalization (Board) to collect the fees established by the Department under the Act. You may expect to receive a demand from the State Board in the near future based on the fee levels described herein. As each phase of activity associated with a fee is completed at the site, a demand for the fee that is associated with the next phase of activity will be sent to you by the State Board. In cases where fees are not paid promptly, the State Board is empowered to seize personal as well as business assets and take other enforcement actions to ensure payment.

*Id.* In response to the Dickerson letter, Neville promptly paid the activity fee. McKnight Decl. ¶ 17.

In conjunction with the implementation of the activity fee program, DTSC issued policy statements to the effect that where a responsible party was complying with the RAO and conducting its own remediation efforts, the activity fee would be the full extent of cost recovery sought by DTSC. For example, DTSC Management Memo 91–1 dated April 17, 1991, states:

Chapter 269, Statutes of 1989, established an activity fee program which partially covers the Department's cost of overseeing hazardous substance release

site investigation and cleanup activities. Under the fee legislation, responsible parties are generally liable for the Department's full cost for performing oversight activities prior to July 1, 1989 when the fee program took effect. For oversight activities conducted after July 1, 1989, responsible parties are expected to pay the activity fees. Although current law (H & SC 25360) continues to provide authority for full cost recovery after giving credit for any activity fees paid, it continues to be the Department's policy (per OPP # 90–1)[4] to only collect direct program expenditures (generally laboratory or contract expenditures) beyond activity fees in cases where the responsible parties are being cooperative.

Byrne Decl., Ex. H; *see also* Pollak Decl., Ex. B.

On April 27, 1992, DTSC issued Management Memo # 91–9, in which it determined that its previously stated policy limiting cost recovery from cooperating responsible parties to the payment of their activity fees "is in conflict with the provisions of H & SC 25360 which essentially requires DTSC to attempt to recover all identified Hazardous Substances Account/bond expenditures." Byrne Decl., Ex. I. The memorandum then announced that "the policy reflected in OPP # 90–1 ... regarding the acceptance of fees as full compensation for oversight costs is rescinded immediately." *Id.* Finally, the memorandum stated that

since there has been no hiatus in the cost recovery requirements of H & SC 25360, [responsible parties] will be liable for all costs identified, in excess of fees

paid beginning July 1, 1989, which is the date of inception of the fee program. This revision provides for full cost recovery regardless of whether DTSC has determined that a [responsible party] is recalcitrant.

*Id.*

On September 21, 2000, DTSC filed a complaint seeking (1) recovery of response costs already incurred by DTSC in conjunction with the cleanup of the Neville site, including interest and attorneys' fees, and (2) a declaration that Neville would be responsible for any future DTSC response costs incurred at the Neville site.

## II. LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If the moving party has sustained its burden, the nonmoving party must then identify specific facts, drawn from materials on file, that demonstrate that there is a dispute as to material facts on the elements that the moving party has contested. *See* Fed.R.Civ.P. 56(c). The nonmoving party must not simply rely on the pleadings and must do more than make

---

4. OPP # 90–1 is a Toxic Substances Control Program Cost Recovery Policy and Procedure manual dated March 1990. The manual provides that cost recovery will be pursued against responsible parties who are conducting their own remediation activities only in extraordinary circumstances including, *inter*

*alia,* violation of an RAO, failure to pay activity fees, unapproved delays in cleanup schedules caused by the responsible party, and submission of poor quality workplans and/or work products. *See* Declaration of Harrison Pollak in support of Pl's. Mot. for Summ. Judg. ("Pollak Decl."), Ex. B at 40.

"conclusory allegations [in] an affidavit." *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). *See also Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. *See also Abromson v. American Pacific Corp.,* 114 F.3d 898, 902 (9th Cir.1997).

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 631 & n. 3 (9th Cir.1987). When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted); *Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co.,* 121 F.3d 1332, 1335 (9th Cir.1997). Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

## III. DISCUSSION

### A. *Prima Facie Liability Under CERCLA*

To establish a *prima facie* case for liability under CERCLA, DTSC must prove: (1) the site is a "facility"; (2) a "release" or "threatened release" of a hazardous substance occurred; (3) DTSC incurred costs in responding to the release or threatened release; and (4) the defendant falls within one of the four classes of responsible persons defined by the statute. 42 U.S.C. § 9607(a); *United States v. Chapman,* 146 F.3d 1166, 1169 (9th Cir.1998). Once DTSC has established a *prima facie* case, the burden shifts to Neville to prove that DTSC's action in response to the CERCLA violation was inconsistent with the NCP, *id.,* or to assert affirmative defenses.

■ DTSC argues that it has made out a *prima facie* case for Neville's liability on undisputed evidence. CERCLA defines a "facility" as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located ...." 42 U.S.C. § 9601(9). DTSC argues, and Neville does not deny, that CERCLA-defined hazardous substances, including dichlorobenzenes, polychlorinated debenzodioxins, polychlorinated dibenzofurans, chloroform, copper, zinc, and lead, have been detected at the Neville site. *See* 40 C.F.R., Part 302.4 (designation of CERCLA hazardous substances); Jeche Decl. ¶ 17 (describing substances found at the Neville site). Therefore, it is undisputed that the Neville site is a "facility" as defined by CERCLA.

CERCLA defines a "release" as "... any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment...." 42 U.S.C. § 9601(22). Neville admits that there have been releases or threatened releases of hazardous substances into the environment from the Neville facility. Amended Answer, ¶¶ 6, 16. The RAP also confirms that hazardous substances were detected in the soil, groundwater, surface water, and air at the Neville site, and identifies potential sources of those releases. Jeche Decl. ¶¶ 7–8, Ex. A at 36. Thus, it is undisputed that there was a release of hazardous substances at the Neville facility.

The third element of CERCLA liability is that the party seeking to recover costs must have incurred them in response to the release of hazardous substances at a facility.[5] "Response" is defined as "remove, removal, remedy, and remedial action." 42 U.S.C. § 9601(25). CERCLA defines these terms to include the cleanup or removal of released hazardous substances from the environment, actions taken in the event of the threat of release of hazardous substances, actions to monitor, assess and evaluate the release or threatened release of hazardous substances, the disposal of removed material, and actions consistent with a permanent remedy. 42 U.S.C. § 9601(23)-(24). Response costs recoverable under CERCLA include oversight costs incurred by a government agency in an effort to ensure that a site is being adequately investigated and remediated by responsible parties. *State of California v. Celtor Chemical Corp.*, 901 F.Supp. 1481, 1489-90 (N.D.Cal.1995); *State of California v. SnyderGeneral Corp.*, 876 F.Supp. 222, 224-25 (E.D.Cal.1994). Recoverable response costs also include reasonable attorneys' fees for bringing cost-recovery litigation, as well as indirect costs, or overhead. *Chapman*, 146 F.3d at 1175 (attorneys' fees); *United States v. R.W. Meyer*, 889 F.2d 1497, 1503 (6th Cir.1989) (indirect costs). DTSC contends, as discussed above, that its employees have spent thousands of hours since 1985 responding to the releases of hazardous substances at the Neville site. DTSC also contends that attorneys in the State Attorney General's Office have spent more than one thousand hours litigating the present case. Declaration of Laurie Pearlman ("Pearlman Decl.") ¶ 7, Pollak Decl. ¶ 5. In a response to an interrogatory, Neville conceded "that DTSC has incurred costs in overseeing the investigation and remediation of environmental contamination associated with the Neville site." Pearlman Decl., Ex. A at 30:3-4. Accordingly, DTSC has established the third element of CERCLA liability.[6]

The final element of liability under CERCLA is that Neville falls within one of the four classes of statutorily defined responsible parties. DTSC argues that Neville is liable under at least two of these categories as (1) "the owner and operator of a vessel or facility"; and (2) "any person [including corporations] who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed[.]" 42 U.S.C. § 9607(a)(1)-(2).[7] Neville admits that it has owned and operated the Neville facility since 1952. Amended Answer ¶¶ 6,9. It also admits that it owned and operated the facility at the time of the disposal of hazardous substances. *Id.* ¶ 16. Therefore, Neville is liable under CERCLA as the owner and operator of the Neville facility.

---

5. CERCLA holds responsible parties liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe *not inconsistent with the national contingency plan.*" 42 U.S.C. § 9607(a)(4)(A) (emphasis added). However, "failure to comply with the NCP is not a defense to liability, but rather a factual issue affecting damages." *Washington State Dept. of Transportation v. Washington Natural Gas Co. ("WSDOT")*, 59 F.3d 793, 798 (9th Cir. 1995).

6. The Court will consider below both Neville's assertion that DTSC should be barred from recovering any costs associated with the Neville site, and its narrower challenge to the propriety and validity of some of the specific response costs put forward by DTSC.

7. The other two statutory categories refer to persons who arranged for disposal or treatment of hazardous substances at the facility, and to transporters of hazardous wastes to the facility. 42 U.S.C. § 9607(a)(3)-(4).

In sum, DTSC has established the four elements of a *prima facie* case for CERCLA liability against Neville. The burden therefore shifts to Neville to refute its liability.

B. *Defenses to Liability Under CERCLA*

Neville asserts six affirmative defenses to CERCLA liability in the Amended Answer. These defenses are: (1) failure to state recoverable CERCLA costs; (2) payment as satisfaction; (3) plaintiff's costs [are] inconsistent with the NCP; (4) statute of limitations; (5) acts or omissions of third parties; intervening and superseding acts; and (6) no CERCLA hazardous substances [were present at the site]. Amended Answer at 5–6.

■ Neville's first, third, fifth and sixth affirmative defenses do not rebut DTSC's *prima facie* case of liability. Neville's first and third affirmative defenses challenge only whether particular costs incurred by DTSC are recoverable, and are therefore not defenses to liability. *See WSDOT,* 59 F.3d at 798 ("failure to comply with the NCP is not a defense to liability, but rather a factual issue affecting damages"). Neville's fifth affirmative defense parallels the language of CERCLA's "innocent landowner" defense, which provides a statutory defense to liability where the release of hazardous substances was due to

> an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant [ ].

42 U.S.C. § 9607(b)(3). In order to be able to assert this innocent landowner defense, the statute provides that a party must also demonstrate, by a preponderance of the evidence, that

> (a) [it] exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) [it] took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions.

*Id.* The defense is unavailable to anyone who contributed, actively or passively, to the release of a hazardous substance at a site. *Carson Harbor Village, Ltd. v. Unocal Corp.,* 270 F.3d 863, 887 (9th Cir.2001) (en banc).. Neville has provided no evidence of the involvement of a third party at the Neville site to whom the release of hazardous substances could be attributed. Furthermore, Neville has not presented evidence which, even when considered in the light most favorable to Neville, would establish that it did not contribute in some way to the release of hazardous substances at the Neville site. Therefore, Neville cannot prevail on its fifth affirmative defense.

■ Neville's sixth affirmative defense is also not available here, because Neville has admitted that "there have been releases, or threatened releases, of hazardous substances into the environment" from the Neville facility. Amended Answer ¶ 6.[8]

■ Neville's second affirmative defense is based on its contention that actions taken by the parties limit DTSC's recovery to the $46,636.38 activity fee which Neville has already paid. Although this defense is entitled "payment as satisfaction" in Neville's amended answer, in its opposition to the present motion Neville recasts its defense as an argument that

8. The RAP for the site prepared by Neville also supplies indisputable evidence of the presence of hazardous substances at the Neville facility. *See* Jeche Decl., Ex. A at 35–49.

DTSC should be barred from recovery because (1) it acted in an arbitrary and capricious manner and (2) its claims are subject to equitable estoppel. DTSC contends that Neville's attempt to assert equitable defenses to liability fails as a matter of law because CERCLA limits available affirmative defenses to those enumerated in the statute. Congress imposed strict, but not absolute, liability under CERCLA. *Levin Metals Corp. v. Parr–Richmond Terminal Co.*, 799 F.2d 1312, 1316–17 (9th Cir.1986). Statutorily defined responsible parties are liable for releases or threatened releases of a hazardous substance "[n]otwithstanding any other provision or rule of law, and subject only to the defenses set forth in [42 U.S.C. § 9607(b)]." 42 U.S.C. § 9607(a). The affirmative defenses set forth in 42 U.S.C. § 9607(b) are that the release of a hazardous substance was "caused solely by (1) an act of God; (2) an act of war; (3) the 'innocent landowner' defense set forth above; or (4) any combination of the foregoing. . . ." The Ninth Circuit has concluded that these statutory affirmative defenses are intended to be exclusive. *See Levin Metals*, 799 F.2d at 1317 ("in order to state a claim for a declaration of nonliability, the declaratory judgment plaintiff *must* base its claim of nonliability on one or more of [42 U.S.C. § 9607(b)'s] statutory affirmative defenses") (emphasis added); *see also United States v. Shell Oil Co.*, 1992 WL 144296, *2 (C.D.Cal.1992) ("this Court must conclude that for the purposes of [liability under § 9607(a) ] of CERCLA, only the enumerated defenses will be recognized"). Other courts have specifically held that equitable defenses cannot be used to preclude liability under § 9607(a) of CERCLA. *See Shell Oil*, 1992 WL 144296 at *8 (defendant's asserted equitable defenses of estoppel, waiver, laches, and unclean hands must be stricken because the language of § 9607(a), which provides for CERCLA liability "notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b)," clearly demonstrates that CERCLA's enumerated affirmative defenses are exclusive); *United States. v. Stringfellow*, 661 F.Supp. 1053, 1062 (C.D.Cal.1987) (accord). Accordingly, the Court finds that Neville's second affirmative defense to CERCLA liability, whether characterized as payment having been satisfied or as equitable estoppel, is unavailable because it is not one of the enumerated affirmative defenses set forth in 42 U.S.C. § 9607(b).[9]

██ Neville's fourth affirmative defense is that DTSC's cost recovery action is barred by the statute of limitations.[10] Neville argues that DTSC's complaint is not timely because it was not filed "within 6 years after initiation of physical on-site construction of the remedial action" as required by CERCLA. 42 U.S.C. § 9613(g)(2)(B). The complaint was filed on September 21, 2000, and is therefore

---

9. Neville also attempts to raise DTSC's alleged arbitrary and capricious conduct as a defense to liability. However, this is a misapplication of the arbitrary and capricious conduct standard, which is employed to measure the consistency of particular cleanup actions with the NCP, and therefore goes to the question of what costs the government is entitled to recover as damages rather than to the question of liability. *See WSDOT*, 59 F.3d at 798 (holding that WSDOT was not entitled to recover response costs under CERCLA where its actions in connection with an environmental cleanup were inconsistent with the NCP to such a high degree as to be arbitrary and capricious, but also stating that "failure to comply with the NCP is not a defense to liability, but rather a factual issue affecting damages").

10. The evidence presented by the parties in regard to Neville's statute of limitations defense is set out more fully in the Court's December 18, 2001 Minute Order denying Neville's motion for summary judgment.

barred by the statute of limitations if on-site construction of the remedial action was initiated before September 21, 1994. The applicability of the statute of limitations here depends of whether the start of construction of groundwater extraction wells, which the parties agree took place in April 1994, formed part of a "removal" action or a "remedial" action prior to September 21, 1994.

CERCLA defines attempts to clean up environmental contamination as either removal or remedial actions. A removal action is defined as

the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous materials into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23). A remedial action is defined as

those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.

42 U.S.C. § 9601(24). The difficulty presented by these two definitions is that they both may cover the same activity. *See Geraghty and Miller, Inc. v. Conoco, Inc.,* 234 F.3d 917, 926 (5th Cir.2000) ("the CERCLA definitions [of removal and re-medial] are expansive enough that certain activities may well be covered by both"); *Public Serv. Co. v. Gates Rubber Co.,* 175 F.3d 1177, 1182 (10th Cir.1999) ("Elements of either response action may overlap and semantics often obscure the actual nature of the cleanup performed.").

*Advanced Micro Devices v. National Semiconductor Corporation,* 38 F.Supp.2d 802, 812 (N.D.Cal.1999), provides some guidance on the question of when an action should be considered a remedial action for purposes of the CERCLA statute of limitations. *Advanced Micro Devices* concerned a situation quite similar to the instant case. Extraction wells initially drilled by plaintiff at its facility in 1986 as part of an "interim remediation program" were eventually incorporated into the final remedial plan for the site in September 1991. *Id.* at 806–07. A CERCLA cost recovery suit for contribution was filed in September 1997. *Id.* at 807. The court considered whether the initial installation of the wells constituted a remedial action which would trigger CERCLA's six-year statute of limitations. Plaintiff argued that no remedial action could take place until a final remedial plan had been officially approved. *Id.* at 811. The court rejected that bright-line test in favor of an analysis of the proximity of the action to the "disclosure of the final remedial design, which may occur prior to approval of the final remedial plan." *Id.* at 812; *see also State of California v. Hyampom Lumber Co.,* 903 F.Supp. 1389, 1393 (E.D.Cal.1995) (holding that a draft RAP constituted a final remedial design); *Geraghty and Miller,* 234 F.3d at 927 (actions cannot be classified as remedial when "Louisiana Department [of Environmental Quality] had yet to issue its final decision, and only that decision will define the ultimate remedial strategy"). The *Advanced Micro Devices* court concluded that the extraction wells could not have been "re-

medial" in 1986 because there was no final remedial design until 1991. *Id.* The court observed that a remedial design could not be considered final while "different alternatives for final remedial action were still being evaluated." *Id.* at 812. The court addressed the fact that the extraction wells were adopted without modification as part of the final groundwater treatment system by noting "the system could not, upon its installation, have 'played a critical role in the implementation of the permanent remedy,' because the permanent remedy was not determined until four years later... The fact that the extraction activities ultimately did not turn out to be 'short-term,' because they were implemented in the final remedy four years later, cannot now be considered in hindsight." *Id.* at 813 (citing *Hyampom Lumber*, 903 F.Supp. at 1393).

In the instant case, Neville argues that the remedial action was initiated in April 1994, when it began construction of the extraction wells. Neville argues that a plan for a "Groundwater Removal Action," ("GRA") approved in April 1993, is identical in all respects to the final remedial plan. Additionally, Neville alleges that DTSC never considered a more aggressive strategy for addressing groundwater contamination on the site than that embodied in the GRA. DTSC argues that although the final RAP for groundwater is essentially the same as the GRA, other options for the treatment of groundwater were evaluated, and there was no guarantee in April 1994 that the final remedial plan would take the form that it did. DTSC presents evidence that diverse solutions to the groundwater contamination problem were still being discussed in Neville's draft FS in December 1994, and that the parties were still considering changes in the groundwater plan up until the RAP was finalized in May 1995. DTSC also offers evidence that, at least as late as an October 6, 1994 letter to Neville, it was insisting that further sampling and monitoring was necessary before the wells proposed in the GRA could be considered the final remedial solution for groundwater at the site. Neville has presented no countervailing evidence. Therefore, the Court finds there is no material question of fact that a final remedial design was not in place on September 21, 1994. Accordingly, the CERCLA statute of limitations does not bar DTSC's cost recovery claim.

In sum, Neville cannot prevail on any of its affirmative defenses. Thus, DTSC has established a *prima facie* case of CERCLA liability against Neville and is entitled to recover all response costs which are not inconsistent with the NCP. In addition, DTSC is entitled to a declaration that Neville is liable for all of DTSC's future response costs not inconsistent with the NCP.

### C. *Inconsistency with the NCP*

Response actions undertaken by a federal or state governmental entity, or an Indian tribe, are presumed to be consistent with the NCP. *WSDOT*, 59 F.3d at 799–800. Thus, when a governmental body such as DTSC seeks to recover its costs, it is the defendant's burden to prove that a particular government action is inconsistent with the NCP in order to preclude the government from recovering the costs of taking that action. *Id.* at 800. In order to meet this burden of proof, the defendant must show that the government's particular action was arbitrary and capricious. *Id.* at 803; 42 U.S.C. § 9613(j)(2).

Here, Neville argues that DTSC's actions are inconsistent with the NCP in two ways. First, as discussed above, Neville argues that DTSC acted in an arbitrary and capricious manner when it allegedly represented that it would not seek cost recovery against Neville, but later did so.

Second, Neville argues that DTSC has offered insufficient evidence to support the recovery of some of its claimed costs. The Court will consider each of these arguments below.

### 1. DTSC's Alleged Representations That It Would Not Seek Cost Recovery.

Neville argues that certain statements and actions by DTSC constituted representations that DTSC would not seek cost recovery from Neville. Neville further argues that these representations render DTSC's decision to pursue full cost recovery arbitrary and capricious.[11] In particular, Neville argues that: (1) the record demonstrates that DTSC offered to dismiss existing cost recovery actions, and to forego future cost recovery actions, in exchange for Neville's voluntary compliance with the RAO, including Neville's commitment to remediate the Neville site; and (2) Neville's payment of the activity fee assessed by DTSC was, pursuant to DTSC's own policy at that time, a full satisfaction of Neville's obligation to pay remediation costs for the Neville site, and DTSC's later policy change, which resulted in the retroactive imposition of full cost recovery on Neville, was arbitrary and capricious.

As a preliminary matter, DTSC argues that, even if it acted in the way that Neville describes, these actions are irrelevant to the question of whether DTSC has complied with the NCP. The NCP "provide[s] the organizational structure and procedures for preparing for and responding to ... releases of hazardous substances." *WSDOT* 59 F.3d at 799 (quoting 40 C.F.R. § 300.1). It "identifies methods for investigating the environmental and

health problems resulting from a release or threatened release and criteria for determining the appropriate extent of response activities." *Id.* (quoting *Matter of Bell Petroleum Servs.*, 3 F.3d 889, 894 (5th Cir.1993)). The NCP does not set forth particular procedures for governmental agencies to follow in pursuing cost recovery. DTSC argues that it is the government's response actions, and not the cost of such actions, that should be analyzed for compliance with the NCP. *See United States v. Hardage*, 982 F.2d 1436, 1443 (10th Cir.1992) ("CERCLA § 107(a)(4)(A) does not limit the government's recovery to 'all reasonable costs;' rather, it permits the government to recover 'all costs of removal or remedial action incurred ... not inconsistent with the [NCP].' [citation omitted] The NCP regulates choice of response actions, not costs. *See* 40 C.F.R. §§ 300.65, 300.68 (1989). Costs, by themselves, cannot be inconsistent with the NCP. Only response actions—i.e., removal or remedial actions—can be inconsistent with the NCP, which can be demonstrated by a showing that the government's choice of response action was arbitrary and capricious."). DTSC therefore argues that any conduct in regard to recovery of costs is consistent with the NCP so long as the underlying actions and investigations for which DTSC seeks to recover costs were consistent with the NCP.

In support of its argument that DTSC's conduct in regard to cost recovery was arbitrary and capricious and thus inconsistent with the NCP, Neville relies on two decisions in *Louisiana–Pacific Corp. v. Beazer Materials & Servs., Inc.*, 811 F.Supp. 1421 (E.D.Cal.1993) ("*LP I*"); 842 F.Supp. 1243 (E.D.Cal.1994) ("*LP II*").

---

11. Many of Neville's arguments are phrased in terms of equitable estoppel—i.e. that DTSC should be equitably estopped from pursuing cost recovery because of its alleged representations that it would not do so. However, given the standard by which compliance with the NCP is judged, for present purposes the Court will construe these arguments as arguments that DTSC acted in an arbitrary and capricious manner.

In *LP I*, the court suggested that the United States Environmental Protection Agency ("EPA") might have acted in an arbitrary and capricious manner by duplicating a private party's remedial investigation of a site. In *LP II*, the same court found that summary judgment as to Louisiana Pacific's ("LP's") liability for particular costs was inappropriate because some of the EPA's alleged duplicative actions may have been in retaliation for LP's refusal to sign a consent decree, and therefore were potentially a violation of LP's constitutional rights. The Court finds that there may be circumstances where the government's conduct in attempting to recover its costs is arbitrary and capricious and thus inconsistent with the NCP.

In the alternative, DTSC argues that even if the Court assumes that the conduct alleged by Neville can potentially create a claim for inconsistency with the NCP, Neville still has not raised a triable issue of fact that DTSC's conduct in regard to cost recovery was arbitrary and capricious.[12] The gravamen of Neville's claim of arbitrary and capricious conduct is that DTSC's actions and policies misled Neville into believing that it would not be held liable for additional response costs if it complied with the RAO and paid the activity fee.[13] DTSC argues that: (1) the record shows that there was no agreement between the parties that DTSC would completely forego cost recovery in exchange for Neville's compliance with the RAO; (2) the policy changes relating to the activity fee paid by Neville were not arbitrary and capricious because at all times DTSC retained statutory authority to pursue full cost recovery, and (3) in any

event, the activity fee paid by Neville only applied to costs associated with the RI/FS phase of the project and therefore, at a minimum, DTSC is entitled to summary judgment as to all other costs.

### a. Compliance With the RAO

 Neville argues that DTSC repeatedly represented that it would not pursue cost recovery actions unless Neville failed to comply with the RAO. DTSC responds that the evidence offered by Neville merely demonstrates that it was DTSC's policy to allow responsible parties to conduct cleanup efforts at their own expense under DTSC supervision and oversight, rather than conducting the entire cleanup itself and subsequently seeking cost recovery from the responsible party for the whole cost of that cleanup. In addition, DTSC argues that none of its statements or actions could be construed as suggesting that Neville would not be ultimately liable for DTSC's oversight costs. The Court will consider these arguments below.

First, Neville argues that the statement contained in the RAO to the effect that Neville may be liable for DTSC's "direct costs and ... administrative overhead costs," if it fails to comply with the RAO, Byrne Decl., Ex. C at 32, implies that Neville would not be liable for cost recovery in the event it complied with the RAO. By contrast, DTSC argues that it did not waive the right to pursue recovery of its oversight costs since the RAO goes on to provide that Neville "may be liable for the costs of oversight" regardless of compliance with the RAO. *Id.* Neville also argues

---

**12.** DTSC also argues that *LP I* and *LP II* are distinguishable from this case. According to DTSC, Neville has not argued, let alone produced evidence, that DTSC pursued any action, such as the duplicative investigation in *LP I*, which created additional or unnecessary costs. Furthermore, DTSC argues, Neville

has made no allegation which raises constitutional questions such as the ones posed by the EPA's alleged retaliation in *LP II*.

**13.** This conduct also forms the basis for Neville's defense of equitable estoppel.

that at a January 1987 meeting, DTSC allegedly represented to Neville's General Counsel that Neville would not be subject to cost-recovery litigation if it "voluntarily and fully compl[ied] with the RAO." McKnight Decl. ¶ 6. DTSC responds that the context of these discussions, which included DTSC's statement that it was "prepared to perform the site assessment required under the RAO if Neville refused to cooperate," *id.*, shows that DTSC's promise to forego cost recovery applied only to costs that it would have incurred if it had been forced to assume complete responsibility for the cleanup of the site due to Neville's noncompliance with the RAO. A similar argument is made by the parties with respect to the January 30, 1987 letter of Angelo Bellomo. Neville argues that Bellomo's statement—"[I]t appears at this time that it may be necessary to utilize bond funds to remediate this site. If bond funds are expended, the Department will undertake cost recovery action."—implies that DTSC would not pursue cost recovery if Neville complied with the RAO. DTSC, by contrast, argues that the context of Bellomo's statement is clearly one in which DTSC may be forced to step in and conduct actual remediation of the site, rather than merely overseeing Neville's efforts. Once again, DTSC argues that there is no evidence in Bellomo's statements that DTSC is waiving the right to recover its oversight costs.

Neville argues that, given the foregoing communications, the agreement between Neville and DTSC that Neville would proceed with the cleanup itself, as embodied in the workplan for remedial investigation prepared by Neville and approved by DTSC, constituted a "deal" that Neville would comply with the RAO and DTSC would forego future cost recovery. Neville argues that DTSC's dismissal of its then existing cost recovery claims in state court is further evidence of that deal. DTSC responds that by approving Neville's workplan, all it did was provisionally agree to let Neville conduct the cleanup, thereby avoiding the necessity of having to undertake the cleanup itself, and the direct costs that it would have incurred had it been obliged to do so. According to DTSC, its dismissal of the complaint merely acknowledged that it would not be incurring the aforesaid direct costs.[14] Thus, DTSC argues, neither its approval of the workplan, nor its dismissal of its state court cost recovery claim, demonstrates that it did not intend to recover its oversight costs at some future point.

At the March 11, 2001 hearing on the present motion, DTSC argued that Neville's payment of an activity fee in conjunction with the RI/FS phase of the cleanup, and its acknowledgment that it "understood ... that Neville could expect an additional Activity Fee to be assigned for subsequent phases of work," McKnight Decl. ¶ 16, demonstrated that Neville knew that compliance with the RAO did not completely excuse its obligation to pay.[15] Neville did not attempt to rebut this argument. In addition, when questioned at the hearing about the extent to which Neville was challenging costs, Neville's counsel stated that it was not disputing all costs, but only those associated with the RI/FS phase of the project, for which Neville had paid an activity fee.[16] Consequently, Ne-

---

**14.** DTSC also notes that the complaint was dismissed without prejudice.

**15.** Neville's payment of the activity fee occurred sometime after September 29, 1989, and the alleged deal between the parties excusing Neville from future payment is based

on statements made and actions taken in 1987 and 1988.

**16.** Neville appeared to argue in its briefs that its payment of the activity fee was a complete satisfaction of all liability for costs at the Neville site.

ville has conceded that it is responsible for some costs and, given that concession, it cannot prevail on its argument that there was an understanding between the parties that it would not be responsible for any costs so long as it complied with the RAO. Therefore, DTSC is entitled to recover all costs not associated with the RI/FS phase of the cleanup of the Neville site, to the extent that DTSC's claims for those costs are properly supported.[17]

### b. Activity Fee Policy

 Neville also argues that DTSC's actions and policies in regard to the assessment of an activity fee were arbitrary and capricious. Neville argues that DTSC represented that as long as Neville complied with the RAO, DTSC would not pursue cost recovery for the RI/FS phase of cleanup beyond Neville's initial activity fee payment of $46,636.38.[18] Neville appears to argue that the September 29, 1989 letter describing the activity fee program suggests that if Neville paid the activity fee, it would not be subject to cost recovery. Neville argues that its interpretation of the September 29, 1989 letter is supported by DTSC's own policy statements. In particular, Neville relies on DTSC Management Memo 91-1, which states that "[a]lthough current law (H & SC 25360) continues to provide authority for full cost recovery after giving credit for any activity fees paid, it continues to be the Department's policy ... to only collect direct program expenditures ... beyond activity fees in cases where the responsible parties are being cooperative."[19] Byrne Decl., Ex. I. In light of this policy, Neville argues that DTSC's subsequent decision to pursue

full cost recovery was arbitrary and capricious. DTSC responds that although DTSC Management Memo 91-1 states a policy of not pursuing full cost recovery from cooperating responsible parties, it also clearly explains that DTSC has the statutory authority, pursuant to Section 25360, to pursue full cost recovery if it chooses to do so. DTSC argues that its reference to its authority pursuant to Section 25360 operates, in effect, as a reservation of rights, and its subsequent decision to pursue full cost recovery is therefore not arbitrary and capricious.

At the hearing on the present motions, Neville argued that it would be inequitable to allow DTSC to change its policy retroactively and impose full cost recovery on Neville, where Neville paid the activity fee and went forward in reliance with the understanding that the fee would represent full payment of its obligation for a particular phase of cleanup. Neville argued that because the policy change was not expressly made retroactive, it could not be applied against Neville. This argument fails for several reasons. First, the statute at issue provided for full cost recovery at all relevant times. Therefore, the policy change did not retroactively affect Neville's rights. Second, while DTSC's decision to pursue cost recovery may reflect an unexpected change in agency policy, it does not rise to the level of arbitrary and capricious conduct that could be considered to violate Neville's due process rights. As such, summary judgment must be granted in favor of DTSC on Neville's claim that DTSC acted in an arbitrary and capricious manner. Therefore, DTSC is entitled to

---

**17.** The Court considers the sufficiency of DTSC's documentation of its costs below.

**18.** As discussed above, Neville stated at the hearing on the present motion that it was only disputing costs associated with the RI/FS phase of the cleanup.

**19.** The policy of only collecting direct program expenditures appears to imply that DTSC would not seek to recover oversight or indirect costs.

recover all properly documented costs of the Neville site cleanup.

### 2. Sufficiency of DTSC's Evidence in Support of Claimed Costs

 Neville also argues that some of DTSC's costs are arbitrary and capricious. First, Neville argues that DTSC appears to be overcharging for some of the work that it did. Second, Neville argues that DTSC has not presented sufficient documentation to support its indirect cost calculations and certain specific cost items. DTSC argues that the burden is on Neville to show inconsistency of costs with the NCP and that Neville has presented no evidence to support its allegations.

Neville's argument that DTSC overcharged for the work that it did has two components. First, Neville argues that DTSC has overcharged it to the extent that it seeks to recover RI/FS costs in excess of the activity fee that Neville has already paid. As discussed above, the Court finds that this argument has no merit.

Second, Neville argues, based on a declaration by its expert Peter Johnson, that DTSC "did not provide full and complete documentation to support its calculation of indirect cost rates." Johnson Decl. ¶ 10. Neville also argues that the summary compilations of activity which DTSC provided with its bills do not provide sufficient information to permit Neville to determine whether those costs are appropriate. In particular, Neville argues that the compilations: (1) fail to provide a specific description of the duties of particular employees who worked at the Neville site; and (2) describe travel expenses but fail to explain what necessitated the travel. Neville argues that the shortcomings of DTSC's records may be inconsistent with the NCP, which mandates that a party claiming costs pursuant to CERCLA collect and maintain documents sufficient to provide an accurate accounting of costs incurred. 40 C.F.R. § 300.160(a)(1). Neville requests that the Court deny or continue the hearing on this issue in order to conduct additional discovery.[20]

DTSC responds that it undertook to explain the calculation of its indirect cost rates in a letter to Neville in 1996, Declaration of Jeffrey J. Mahan ("Mahan Decl."), Ex. B at 55, and that the summary compilations of activity it submitted to Neville are amply supported by records that it maintains consistent with the NCP. DTSC further argues that if Neville questions the validity of DTSC's methodology for calculating costs, or the sufficiency of the evidence of particular expenses, it is Neville's burden to request the supporting documentation through discovery, and to point to specific ways in which the methodology or the evidence was inconsistent with the NCP. According to DTSC, mere conclusory statements that costs are unreasonable or inappropriate are not sufficient. *See United States v. Kramer,* 757 F.Supp. 397, 436 (D.N.J.1991) ("terms used by defendants such as 'proper' or 'improper,' 'remote, speculative, and contingent,' and 'unreasonable, duplicative, and not cost-effective,' do not state an appropriate challenge to the propriety of the government's costs and will be stricken"). In regard to Neville's request for additional discovery, DTSC argues that Neville has been on notice of the cost issues to which it now objects for several years, and has had ample opportunity to conduct discovery. According to DTSC, Neville did not serve any discovery in this case until February 27, 2002, two days after it filed its opposition, forty days after it was served with DTSC's summary judgment motion, and three months after the initial discovery cut-off. Nonetheless, the current discov-

---

**20.** The current discovery cut-off in this case is April 2, 2002.

ery cut-off in this case is April 2, 2002. Therefore, the Court will take this issue under submission to allow Neville to conduct additional discovery. Neville may submit supplemental briefing on this issue within 20 days of the close of discovery. DTSC may respond to any such briefing within seven days of its being served on them.

### D. *DTSC's Request For Interest and Attorneys' Fees*

■■■ As discussed above, the Court finds that DTSC may recover from Neville all properly documented cleanup costs. The Court also finds that DTSC is entitled to interest on those costs. However, because there are outstanding issues concerning documentation of costs, the Court will not grant summary judgment as to the amount of interest. For similar reasons, the Court declines to allow DTSC to recover its attorneys' fees at this time.

## IV. CONCLUSION

For the reasons discussed above, plaintiff's motion for summary judgment is GRANTED in part as to defendant's liability under CERCLA. The remainder of plaintiff's motion, regarding its ability to recover costs, interest and attorneys' fees, will remain under submission pending additional discovery and briefing as described above.

IT IS SO ORDERED.